**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MOSES RICHARDSON** ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 11 C 7080 |
| ) | |
| v. ) | Magistrate Judge Daniel G. Martin |
| ) | |
| **MICHAEL J. ASTRUE** ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Moses Richardson ("Plaintiff" or "Richardson") seeks judicial review of a final decision of Defendant Michael J. Astrue, the Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for Supplemental Security Income benefits ("SSI") under Title II of the Social Security Act, and Richardson filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. The parties have consented to have this Court conduct all proceedings in this case, including an entry of final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). For the reasons stated below, Plaintiff's motion is granted in part and denied in part.

## I. Legal Standard

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for

a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. §

404.1520(a)(4)(v).

### B.  Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).  Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence.  *Elder*, 529 F.3d at 413 (citation omitted).

## II.  <u>Background Facts</u>

### A.  Medical History

In 1999, Richardson was attacked with a baseball bat and suffered a fracture to his right femur.  No medical records concerning this event are part of the record, which

significantly post-dates Richardson's injury. However, Richardson's later statements to his physicians show that surgery was performed to repair the fracture, and a metal rod was placed in the leg. The record does not suggest that Richardson sought any treatment for his leg from the time of surgery through 2008. An April 2008 x-ray taken to evaluate complaints of knee pain shows a healed supracondylar fracture of Richardson's femur. (R. 421).

The earliest treatment note in the record shows that Richardson arrived at the Ambulatory and Community Health Network ("ACHN") in March 2008 complaining of leg pain, back pain, and depression. (R. 452). One month later, he also went to the Provident Hospital emergency room complaining of lower back pain. (R. 480). An examination showed a reduced range of spinal motion due to pain. Richardson was released the same day with muscle relaxants and pain medication. (R. 480-81).

Richardson continued to seek relief from pain with further visits to ACHN in May and June 2009. A June 26, 2009 visit with ACHN resulted in a referral to physical therapy, (R. 499), and Richardson presented for a physical therapy evaluation on July 20, 2009. The therapist noted that he showed a severely antalgic gait with significant tightening of the right leg's soft tissue. (R. 506-07). An August 6, 2009 progress note states that Richardson was non-compliant with his home exercise program, and his therapist emphasized the importance of full compliance. (R. 507).

In addition to his leg and back pain, Richardson also experienced continuing problems with depression and anxiety. He stated that he had received medication for depression from ACHN/Provident Hospital, but the records on that issue are largely illegible. Other records suggest that he had been prescribed the antidepressant

4

medication Prozac at ACHN. On January 13, 2010, Richardson sought more active treatment by telephoning the Greater Grand Chicago Mental Health Center ("GGMHC"). He stated that he had been taking medication, but that the ACHN program had subsequently been closed. (R. 513). Richardson stated that he was living alone in his mother's basement and felt suicidal. He described his family situation as very stressful and told the intake clerk that he had earlier stabbed his brother because he felt annoyed by him. Richardson denied any drug use, but he admitted to an occasional drink. (R. 513).

On January 26, 2010, Richardson followed up this phone contact by meeting with GGMHC therapist Marie Jackson. Ms. Jackson stated that Richardson was currently taking Prozac, which was helping to reduce his symptoms. Richardson was also taking gabepentin and wearing a lidoderm patch for pain. (R. 516). Richardson reported that he was easily agitated and had felt the impulse the day before to kill himself by walking onto the expressway. (R. 516). He denied any current suicidal ideation at his meeting with Ms. Jackson. However, Richardson admitted to drinking alcohol once a week in order to relax. (R. 523). Ms. Jackson diagnosed Richardson as suffering from alcohol abuse, depression, anxiety, a post-traumatic stress disorder ("PTSD"), "psychotocism," and a schizoaffective disorder. (R. 523). She concluded by finding that none of Richardson's symptoms would prevent him from recovering fully or functioning adequately within the community. (R. 524).

Ms. Jackson met with Richardson on at least three occasions in February and April 2010 and recommended that he be evaluated by a psychiatrist. On March 10, 2010, Richardson met with psychiatrist Dr. Sylvia Santos at GGMHC. Dr. Santos noted that Richardson had been sober for several months, though he smoked marijuana daily. (R. 539). Richardson reported feelings of deep stress, agitation, anger, and fleeting suicidal

thoughts. Dr. Santos diagnosed Richardson as suffering from alcohol abuse, cannabis abuse, and depression. (R. 545). She advised Richardson that it was important for him to refrain from alcohol and marijuana while taking Prozac, which she prescribed at a dosage of 20 mg. a day. (R. 545-46).

**B.    Consulting and State Agency Physicians**

**1.    Dr. Rochelle Hawkins**

Internal medicine specialist Dr. Rochelle Hawkins examined Richardson on March 7, 2007. Richardson stated that he was experiencing pain at level of 8 or 9 out of 10, but that he did not take medication due to a lack of funds. Dr. Hawkins' examination showed that Richardson had a full range of motion with no tenderness in any joint. He did report some lower back pain. However, Dr. Hawkins concluded that Richardson had full flexion and extension in his back and that an x-ray showed no significant degenerative changes to his spine. Richardson told Dr. Hawkins that he only smokes marijuana occasionally, but he drinks whenever he can find money to buy alcohol. (R. 415-17).

**2.    Dr. Kenneth Gong**

On April 24, 2008, Richardson was examined by internal medicine specialist Dr. Kenneth Gong. Richardson reported that he had leg pain that radiated up through the hip and that he had also experienced back pain since 2007. He described his back problems as pain that began in the lower spine and radiated both up and, at times, down his leg. Richardson also told Dr. Gong that he had tried to commit suicide in 2003 or 2004 by swallowing a bottle of Tylenol. The physician's report states that Richardson told Dr. Gong that he last used marijuana in the summer of 2007, and that he currently drank three beers

and three shots of whisky each week.  After conducting a mental status exam, Dr. Gong concluded that Richardson could not manage his own funds because of his recent history of marijuana use.  According to Dr. Gong, Richardson "would likely use available funds for that purpose."  (R. 422-26).

### 3.    Dr. Donald Henson

On May 27, 2008, state agency psychologist Dr. Donald Henson issued a Psychiatric Review Technique ("PRT") evaluation for Richards.  He found that Richardson suffered from major depression, PTSD, and a substance abuse disorder.  Dr. Henson concluded that Richardson had mild limitations in his activities of daily living, social functioning, and in maintaining concentration, persistence, and pace.  No episodes of decompensation were noted, and no Paragraph C criteria of the Listings were found.  Dr. Henson discounted the severity of Richardson's claimed limitations because he had never sought any mental health treatment and had not alleged a mental impairment in previous disability applications.  (R. 461-74).  The ALJ gave "great weight" to Dr. Henson's PRT and mental RFC.  (R. 50).

### 4.    Dr. Robert Prescott

On May 1, 2008, Dr. Robert Prescott met with Richardson to conduct a mental status evaluation.  Richardson reported that he had never received any mental health treatment, though he had felt depressed since his leg was fractured in 1999.  Several factors contributed to his distress.  Richardson's daughter had been attacked and raped, one of his sons had been mugged, and another son was imprisoned.  Richardson stated that he lived in his mother's basement and spent most of his time watching TV or looking

out the window.  Richardson also told Dr. Prescott that he drinks and smokes marijuana on occasion.  The most recent events included having two beers on May 6, 2008 and smoking marijuana once during the previous month.

Dr. Prescott applied a number of cognitive tests and found that Richardson performed poorly on computations and had a poor ability to think abstractly.  He diagnosed Plaintiff with a moderate to severe depression with sporadic psychotic factors, chronic PTSD, a learning disability, and substance abuse.[1]  (R. 432-37).

### C. Hearing Testimony

### 1. Claimant's Testimony

ALJ Logan held two hearings at which Richardson testified.  Plaintiff stated at the first hearing that he was a 46 year old African-American who left school in the ninth grade after becoming a father.  (R. 122, 149).  By the time of the second hearing, Richardson was 47 years old.  (R. 60).  Richardson stated that his physical difficulties began when he was mugged in 1999 while returning from the grocery store.  His attackers beat him with a bat and broke the femur in his right leg.  (R. 71).  His injuries required surgery, including the placement of a metal rod in his leg.  (R. 72).

Richardson described his physical complaints to the ALJ and then testified to a range of psychological issues that he believed stemmed from his 1999 attack.  He claimed that he attempted to commit suicide by taking a bottle of Tylenol tablets "a while back" and that he had recently tried to harm himself by walking onto the expressway.  (R. 75).  He did

---

[1]  The record also contains reports by state agency physician Dr. Marion Panepinto and treating physician Dr. Isaiah Perry.  The Court omits a review of these reports.  Neither side cites them, and they are not directly relevant to the issues at hand.

not go through the with second act because another person present at the scene told him not to do it. (R. 75). Richardson stated that at times he sees things that do not exist, particularly dark shadows, and he hears his mother's voice. (R. 136-38).

Plaintiff also described his relations with other people as difficult, stating that he often "flies off the handle." (R. 152). He lives in the basement of his parents' home and spends most of his day there because he feels safe. (R. 152-53). He only occasionally leaves to buy small items at the store. Richardson's daily activities are largely limited to playing music, folding clothes, and watching television, though he sometimes feeds his mother's dogs and engages in light gardening and walking. (R. 139, 144, 147, 152).

Richardson stated that he had not reported psychological issues as part of his earlier applications for disability benefits because he did not think about it. (R. 78). Along those lines, he also testified that he has always had difficulty in reading and concentrating. (R. 132-33). He has no friends. (R. 140). Richardson stated that he had sought weekly mental health treatment for one-half of a year at Provident Hospital and that he was scheduled to begin additional therapy soon after the first hearing. (R. 136-37). The medication he took for depression and anxiety helped to some degree. (R. 137, 156).

Richardson denied any current alcohol or marijuana use. (R. 92). He stated that he began drinking around age ten and drank up to four times a day until his mid-thirties. (R. 91). His last drink was a beer that he had on his birthday. (R. 92). Richardson stated that he stopped smoking marijuana in 2008 or 2009. (R. 93). Prior to that time, he smoked marijuana once a day. However, when the ALJ asked Richardson about Dr. Gong's statement that Richardson was currently drinking beer and whisky, Richardson stated, "I really can't say." (R. 93).

### 2. Dr. Ellen Rozenfeld

Psychologist Dr. Ellen Rozenfeld was present at the second hearing before the ALJ. She testified that Richardson had consistently reported the impact of his 1999 attack. His symptoms included depression, a stressful home environment and PTSD. Dr. Rozenfeld stated that Richardson gave evidence of sporadic psychotic features, though he was goal-oriented and could respond to questions appropriately. He also showed a history of poly-substance abuse. Dr. Rozenfeld concluded that Richardson's impairments included an affective disorder, an anxiety disorder, PTSD, and a history of marijuana and alcohol use. (R. 89-90).

### 3. Dr. Walter Miller

Medical expert Dr. Walter Miller also testified at the second hearing. Based on his review of the medical records, Dr. Miller agreed with the physical RFC given by the state agency physician and found that Richardson could perform light work, with the additional limitation that he not be required to balance frequently. However, the medical expert took issue with Richardson's testimony concerning alcohol and drugs. According to Dr. Miller, records from 2007 indicated that Richardson drank whenever he had the money to do so, and he used marijuana in April of 2008. (R. 92). Based on his review of the record, Dr. Miller stated that none of Richardson's conditions met or medically equaled a Listing.[2] (R. 99-105).

---

[2] Vocational expert Melissa Benjamin also testified at the second hearing. The Court does not cite it here because Richardson does not allege any error in her testimony or the ALJ's reliance on it.

### D. The ALJ's Decision

On August 14, 2010, ALJ Michael Logan issued a detailed decision and found that Richardson was not disabled. He determined at Step 1 that Richardson had not engaged in substantial gainful activity since his onset date of February 15, 2008. At Step 2, the ALJ found that Richardson's severe impairments included substance abuse disorder; depression with sporadic psychotic features and/or schizoaffective disorder; PTSD; status post internal fixation of a fractured leg; and mild degeneration of the lumbar spine. The ALJ also applied at Step 2 the "special technique" required under 20 C.F.R. § 1520(a) for assessing the severity of mental disorders. He concluded that Richardson had a mild restriction in his activities of daily living, a moderate restriction in social functioning, and marked difficulties in concentration, persistence, and pace. One to two episodes of decompensation were also found. Richardson's impairments did not meet or medically equal a Listing at Step 3.

Before moving to Step 4, the ALJ assessed Richardson's credibility and found that his testimony was not credible. No past relevant work was found at Step 4. The ALJ then split his decision into two parts. He first determined Richardson's RFC under the assumption that he suffered from a substance abuse disorder. This scenario yielded the following RFC:

> The claimant has the [RFC] to stand/walk 6 hours in an 8-hour workday and sit 6 hours out of an 8-hour workday; lift/carry 20 pounds occasionally and 10 pounds frequently; push/pull without limit; occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds; occasionally balance, stoop, crouch, crawl, kneel; work without manipulative or visual limitations; work without communicative limitations or environmental limitations; perform simple, routine tasks; work with minimal contact with coworkers and supervisors and no public contact; demonstrate no decompensations; and **maintain concentration, persistence and pace with a marked limitation,**

**which is pegged at a 75% residual of the workday**.

(R. 43) (emphasis added). Based on this RFC, the ALJ found at Step 5 that no jobs existed in the national economy that Richardson could perform. This meant that Richardson was disabled.

When alcohol or drugs play a role in disability, the regulations also require an ALJ to determine if a claimant like Richardson would be disabled if he were not a substance abuser. To that end, the ALJ reassessed Richardson's condition to determine his functioning if substance abuse were not present. The ALJ revised his special technique findings by changing the limitation on Richardson's ability to concentrate from marked to mild. He then amended the last sentence of the RFC to reflect this less restrictive limitation and to find that Richardson could now work 95% of a workday. (R. 45). The ALJ concluded that jobs existed under this RFC that Richardson could perform, and Plaintiff was found to be not disabled. (R. 51-52).

### III.  Discussion

Richardson challenges the ALJ's decision on three grounds. He claims that: (1) neither RFC accounts for the side effects of Richardson's medications; (2) substantial evidence does not support the ALJ's materiality finding; and (3) the two RFC assessments cannot be given meaningful review. In his motion, Richardson supports the second and third of these claims with different aspects of the same arguments. The Court thus addresses these claims in tandem with one another.

### A.    The Side Effects Issue

An ALJ's RFC assessment must be based on "all the relevant evidence in [the] case

record." 20 C.F.R. § 404.1545(a)(1). This includes an account of "the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, [and the] *side effects of medications*)." SSR 96-8p (emphasis added). Richardson argues that the RFC in this case requires remand because the ALJ did not take into account the side effects that Richardson's medications had on his ability to work.

The Court finds this argument unpersuasive. It is true that the ALJ's RFC discussion did not mention any side effects of Plaintiff's medications. However, Richardson does not cite any part of the objective medical record to support a claim that his medications produced side effects that limited his ability to work. Instead, he relies entirely on his testimony that both gabapentin and Prozac make him drowsy during the day. Richardson's reliance on his own statements overlooks that the ALJ did not find Richardson's testimony on this (or any other) issue to be credible. Richardson does not challenge the credibility finding, nor does he provide any explanation of why the RFC should have incorporated side effects that the ALJ rejected in his credibility analysis. Without a citation to the objective medical record or a challenge to the credibility finding, Richardson's motion is denied on this point. *See Cook v. Astrue*, 800 F. Supp.2d 897, 909 (N.D. Ill. 2011) (stating that an ALJ is permitted to "discount testimony regarding side effects of medication that are unsubstantiated by objective evidence") (citing *Nelson v. Sec. of Health & Human Servs.*, 770 F.2d 682, 685 (7th Cir. 1985)).

### B.     The Materiality and RFC Findings

Richardson next challenges the ALJ's conclusion that substance abuse materially

contributed to his disability. Richardson claims that the ALJ applied the wrong legal standard to his analysis of this issue and that substantial evidence does not support the ALJ's conclusion. In essence, Richardson argues that the ALJ substituted his own opinion for objective medical evidence, thereby impermissibly "playing doctor." *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (stating that ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings").

Evidence that a claimant suffers from substance abuse imposes special analytic burdens on an ALJ. A claimant who is addicted to drugs or alcohol cannot be found to be disabled for social security purposes on that basis. However, a disabled applicant's impairments may include substance abuse as well as other severe conditions. When that is the case, a disabled claimant is also not entitled to disability benefits if alcoholism or drug addiction is "a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). Thus, "[w]hen an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the [ALJ] is whether, were the applicant not a substance abuser, she would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1535(b)(1).

An ALJ must address this issue by first evaluating an applicant's disability claim irrespective of substance abuse. If the claimant is not disabled under this analysis, the inquiry ends. If the claimant is found to be disabled, the ALJ evaluates which of a claimant's current limitations would remain if he stopped using alcohol or drugs. The ALJ then assesses whether the remaining restrictions would be disabling when they are considered without substance abuse. If they are not disabling, then substance abuse is

material to the disability finding.  Such a claimant is not entitled to benefits.  20 C.F.R. § 404.1535(b)(2).

Richardson claims that the correct standard in this analysis asks if an applicant's addiction gives rise to his disability.  He argues that the ALJ incorrectly applied this standard by requiring evidence that substance abuse did *not* cause his disability.  The Court disagrees with these claims, at least in the narrow form in which Richardson states them.  The regulations do not rely on a standard of direct causation, as Richardson assumes.  They stress that the primary inquiry is whether substance abuse is a "contributing factor material" to an applicant's disability.  20 C.F.R. § 404.1535(b).  Addiction can presumably be a contributing factor without being an immediate or sole cause by acting in combination with other impairments.  Conversely, courts have also found that an addiction may not be "material" under the regulations even if it causes a claimant's disability.  *Pettit v. Apfel*, 218 F.3d 901, 904 (8th Cir. 2000) ("[E]ven if long-term alcohol abuse causes a disability, alcoholism will not be found 'material' to the finding of disability if the disability remains after the claimant stops drinking.");  *Harmison v. Halter*, 169 F. Supp.2d 1066, 1070 (D. Minn. 2001).

The more relevant inquiry is whether the ALJ followed the directives set forth in the regulations: (1) make a disability decision that accounts for all the evidence, and (2) then "evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling."  20 C.F.R.  § 404.1535(2).  ALJ Logan correctly followed this standard in his decision.  Richardson objects that the ALJ erred by placing the burden of proof concerning the

addiction issue on him instead of on the Commissioner. But for all of its detail, the ALJ's decision did not clearly state who bears the burden of proof on the substance abuse issue.[3] (R. 27). Remand is not required on this basis.

The Court has more serious concerns about how the ALJ reached his RFC conclusions. As stated above, the ALJ found that if Richardson stopped using drugs and alcohol, his ability to concentrate would improve from a marked to a mild limitation. This is a significant change that skipped the intermediate "moderate" category and placed the least restrictive limitation on Richardson, short of finding that his concentration was not limited at all. As a result, the ALJ found that Richardson's ability to work would increase from 75% to 95% of a normal workday.

The reasoning that supports this conclusion fails to build a logical connection between the record and the ALJ's findings. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (stating that an ALJ is always required to "build a logical bridge between the evidence and his conclusion."). The ALJ began his discussion of the revised RFC by citing Dr. Rozenfeld's statements at the hearing. Unfortunately, Dr. Rozenfeld did not testify on the effect substance abuse has on Richardson's mental functioning. She largely summarized other portions of the record for the ALJ. These sources also fail to state how

_____

[3] The ALJ may have declined to take a position because the Seventh Circuit has not definitively ruled on who has the responsibility for showing that addiction is not a contributing factor. An unpublished opinion held that the claimant bears the burden, *Harlin v. Astrue*, 424 Fed. Appx. 564, 567 (7th Cir. 2011), and most courts in this Circuit have followed that standard. *See, e.g., Gritzmacher v. Astrue*, 572 F. Supp.2d 1051, 1060 (W.D. Wis. 2008); *Mayes v. Astrue*, No. 1:07-cv-0193, 2008 WL 126691, at *7 (S.D. Ind. Jan 10, 2008). However, at least one district court has disagreed. *See Whitney*, --- F. Supp.2d ---, No. 10 C 4231, 2012 WL 3686651, at *7-8 (N.D. Ill. Aug 24, 2012) (placing the burden on the Commissioner). For the reasons discussed below, the issue is not determinative in this case.

Richardson would function if he stopped using drugs and alcohol. Dr. Rozenfeld concluded from her record review that Richardson's impairments include an affective and anxiety disorder, PTSD, and a history of alcohol and marijuana use. (R. 89-90). But she did not state what she believed Richardson's ability to concentrate might be, either with or without the presence of substance abuse. In the absence of such testimony, the ALJ was required to explain more fully how he inferred from Dr. Rozenfeld's statements that Richardson's concentration and ability to work would improve if he stopped using drugs and alcohol.

The ALJ also relied on statements made by GGMHC therapist Ms. Jackson. The ALJ noted that Ms. Jackson stated that Richardson had a minimal risk for relapse and that his symptoms showed that he could "function adequately within the community." (R. 46, 524). The link between these statements and Richardson's concentration is not clear. Ms. Jackson expressed no view on Richardson's ability to concentrate; she only stated that his social functioning might be adequate. The ALJ's unexplained association of social functioning and concentration overlooks that these are separate functional categories governed by different standards. Social functioning refers to a claimant's "capacity to interact independently, appropriately, effectively, on a sustained basis with other individuals." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C(2). This is what Ms. Jackson addressed. By contrast, concentration "refers to the ability to sustain focused attention . . . sufficiently long to permit the timely and appropriate completion" of work tasks. *Id*. at § 12.00C(3). Ms. Jackson's comments do not address this issue at all.

As for work, the fact that Richardson could operate normally within social situations does not necessarily mean that he could function 95% of the time in a work setting. *Cf. Roddy v. Astrue*, --- F.3d ---, No. 12-1682, 2013 WL 197924, at *7 (7th Cir. Jan. 18, 2013)

(stating that a claimant's ability to work cannot be derived automatically from his ability to perform daily tasks). The regulations caution that an ALJ must take special care in assessing a claimant's capacity to sustain concentration "under the stresses of employment during a normal workday[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C(3). The ALJ gave no indication of how he translated Richardson's social functioning into a finding about his ability to deal with the pressures of a work setting.[4]

The ALJ's use of Ms. Jackson's note illustrates a deeper problem with the dual analysis of Richardson's RFC. Richardson argues that the two RFCs defy meaningful review because the ALJ did not explain how the evidence accounts for the distinctions between them. The Court agrees. Ms. Jackson's note assumed the presence of substance abuse, yet the ALJ cited it to support his finding of what Richardson could do if he *stopped* using drugs and alcohol. The same can be said for Dr. Rozenfeld, Dr. Santos, and Dr. Henson, all of whom stated that Richardson suffered from substance abuse. If these sources are evidence of Richardson's RFC without alcohol, as the ALJ believed, then he was required to explain why they do not also support what Richardson could do if he failed to stop drinking. As its stands, the ALJ did not state what part of the record supported his first finding that Richardson could only work at a 75% rate. He also failed to discuss how he factored out the role of substance abuse in the medical sources

---

[4] The results of a mental status examination can also guide an ALJ's analysis of a claimant's ability to concentrate, though the regulations stress that other evidence should also be considered. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C(2). ALJ Logan discussed Dr. Prescott's mental examination of Richardson at great length in one part of his decision (R. 34-36), but the revised RFC discussion did not cite Dr. Prescott at all. It is entirely unclear if the ALJ relied on the mental status exam to reach either his first or second RFC conclusions.

he relied on to find that Richardson could work at a 95% rate if he stopped drinking. *See* SSR 96-8p (requiring an ALJ to provide a narrative discussion of how the evidence supports the RFC findings).

The ALJ did try to build a bridge between his findings and the record by citing comments made by Richardson's psychiatrist Dr. Sylvia Santos. Dr. Santos stated in a treatment note that she and Richardson "discussed the importance of sobriety and abstaining from illicit drugs while on psychotropic meds." (R. 546). The ALJ relied on this fleeting remark to conclude that Richardson's substance abuse was a contributing factor that was material to his disability. He stated: "Obviously the doctor said that because drinking alcohol for this claimant highly adversely impacts his behavior and his general ability to function." Based on this and other evidence, the ALJ concluded his materiality discussion by stating that "the record makes it obvious that [h]is marijuana abuse and alcohol abuse drives his mental dysfunctionality." (R. 47).

The ALJ erred once again by not explaining how Dr. Santos' comments can be used to reach this critical finding on the materiality of Richardson's substance abuse. Contrary to the ALJ's assumption, Dr. Santos expressed no opinion on the degree to which alcohol and drugs contribute to Richardson's mental impairments. In fact, if her statement means what the ALJ assumes, it is difficult to understand why she advised Richardson to refrain from illicit substances only "while on psychotropic meds[ ]" instead of permanently.

One common-sense interpretation of Dr. Santos' remark is that psychiatric drugs like Prozac simply do not mix well with drugs and alcohol. *See Alcohol and Prozac*, http://depression.emedtv.com/prozac/alcohol-and-proxac.html (last visited Jan. 25, 2013) ("Sometimes people are warned to avoid alcohol while taking Prozac"). This conclusion

is supported by other comments the psychiatrist made under a heading titled "Educational Material Received." This section states that Dr. Santos gave Richardson general information concerning the proper storage of his medication, the proper foods to eat with them, and "use of alcohol/drugs with your psychotropic medication." (R. 546). A reasonable inference from these remarks is that Dr. Santos was giving Richardson broad advice that would apply to most patients taking Prozac, not that she believed that substance abuse was the direct cause of his emotional problems.

As it stands, the ALJ's conclusion that it is "obvious" that substance abuse "drives [Richardson's] mental dysfunctionality" is unsupported by the evidence cited in the decision. The ALJ's discussion of this important finding does not rely on any medical expert who actually reached such a conclusion. Instead, the ALJ made a medical finding concerning Richardson's functioning that is independent of the objective record. That was erroneous. An ALJ is always entitled to weigh the evidence, including conflicting medical records, and to draw appropriate inferences from it. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). But an ALJ cannot "play doctor" by substituting his own opinion for that of a physician unless he relies on other medical evidence to do so. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). Such an error requires reversal. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).

The Commissioner argues that substantial evidence still supports the ALJ's second RFC because he adopted Dr. Henson's PRT assessments. It is true that both Dr. Henson and the ALJ found that Richardson had only a mild limitation in his ability to concentrate. That said, the relation between the ALJ's decision and the PRT is more problematic than the Commissioner allows. The ALJ clearly believed that Richardson's restrictions were

more limiting than Dr. Henson concluded. Dr. Henson found that Richardson had a mild limitation in his social functioning. Both of the ALJ's RFCs assessed the restriction at the more limiting level of "moderate." (R. 42, 44). In addition, Dr. Henson did not find that Richardson's mental impairments were even severe (R. 461), but the ALJ concluded at Step 2 that they were.[5] An ALJ does not err by rejecting some parts of a medical source opinion and adopting others. In this case, however, the ALJ did not explain why he gave great weight to the PRT, apparently intending to adopt it, when he plainly concluded that Richardson's affective and substance abuse disorders were more limiting than Dr. Henson believed.

More seriously, the ALJ failed to recognize fully that the PRT was based on a set of assumptions that had changed by the time the ALJ issued his decision. Dr. Henson discounted the severity of Richardson's limitations based, at least in part, on the fact that he had not sought any mental health treatment when Dr. Henson reviewed the record. By the time of the decision, Richardson had seen Ms. Jackson and Dr. Santos, and he had been placed on Prozac. These facts remove one of the main premises of Dr. Henson's assessment. It is possible, therefore, that Dr. Henson might not have reached the same conclusions had he assessed Richardson in 2010 instead of in May 2008.

The ALJ dismissed this possibility by once again citing Ms. Jackson's statement that Richardson could function adequately in the community. (R. 50). The Court cannot follow the logic of this reasoning. As discussed earlier, Ms. Jackson's statement does not address Richardson's concentration or his ability to work at a rate of 95%, and the ALJ did

---

[5] On remand, the ALJ shall resolve the contradictions between his reliance on the PRT and his findings on these issues.

not explain why her comment justifies continued reliance on the PRT's concentration finding. Indeed, the logical link between Ms. Jackson and Dr. Henson is especially hard to understand in this context. The ALJ cited her comment on social functioning as a support for the PRT; without explanation, he then amended the PRT's actual finding on social functioning but adopted the assessment on concentration.

The logical bridge an ALJ must build involves a "lax" standard that only requires minimal articulation. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). Even under this broad standard, however, the ALJ was required to explain more fully why he agreed with the PRT and how the evidence supported his revised finding that Richardson could work at a rate of 95% during a normal day. *See Hodes v. Apfel*, 61 F. Supp.2d 798, 806 (N.D. Ill. 1999) ("Even if enough evidence exists in the record to support the decision, [a court] cannot uphold it if the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.") (internal quote and citation omitted). Plaintiff's motion is granted on these issues.

## IV. <u>Conclusion</u>

For the reasons stated above, Plaintiff's Motion for Summary Judgment [20] is granted in part and denied in part. This case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**ENTERED:**

_Daniel G. Martin_

_____
**DANIEL G. MARTIN**
**United States Magistrate Judge**

Dated: January 31, 2013